## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  23-CR-00136-GKF-7 |
| | ) | |
| JOSEPH ANTHONY RANIEWICZ, | ) | |
| | ) | |
| Defendant. | ) | |

### OPINION AND ORDER

This matter comes before the court on the Motion to Suppress Evidence [Doc. 75] of defendant Joseph Raniewicz.  For the reasons set forth below, the motion is granted.

### Background/Procedural History

On October 29, 2022, Tonto Apache Tribal Police Department Officer Scout Butler effected a traffic stop of Mr. Raniewicz for violation of Ariz. Rev. Stat. § 28-754 – Turning Movements and Required Signals.  The stop eventually resulted in a search of Mr. Raniewicz's vehicle during which Officer Butler discovered approximately fourteen pounds of methamphetamine, as well as drug paraphernalia.

On April 5, 2023, a grand jury returned an Indictment charging Mr. Raniewicz with a single count of Drug Conspiracy pursuant 21 U.S.C. §§ 846 and 841(b)(1)(A)(viii).[1]  [Doc. 2].  Trial of this matter is scheduled to begin on October 16, 2023.  [Doc. 90].

In advance of trial, Mr. Raniewicz filed a motion seeking to suppress all physical evidence and oral statements obtained as a result of the search and seizure incident to the October 29, 2022 traffic stop.  [Doc. 75].  The government has responded in opposition.  [Doc. 94].

---

[1] The Indictment includes eight additional counts in which Mr. Raniewicz is not charged.

Neither Mr. Raniewicz nor the government has requested an evidentiary hearing. [Doc. 75; Doc. 94]. Having reviewed the briefs and evidence in this matter, and in light of the fact that a hearing has not been requested, the court concludes that the motion may be decided on the briefs and a hearing is unnecessary.

### Relevant Facts

On October 29, 2022, Mr. Raniewicz and his fifteen-year-old son were traveling in Arizona in a rental vehicle and stopped at the Tonto Apache Tribal Market. At approximately 4:56 p.m., Officer Butler observed Mr. Raniewicz's rental vehicle, a 2022 gray Honda Accord, and noticed a radar detector mounted directly in the middle of the windshield. [Doc. 75-1 at p. 6]. Based on his training and experience, Officer Butler believed radar detectors "to be commonly used [by] subjects wanting to know the location of law enforcement in different jurisdictions." [*Id.*].

Officer Butler then observed a male subject and male juvenile, later identified as Mr. Raniewicz and his son, exit the Tribal Market with snacks and drinks. [*Id.*]. Mr. Raniewicz looked directly into Officer Butler's patrol vehicle, abruptly looked in the opposite direction, and pulled his hat down lower over his face. [*Id.*]. Officer Butler "believed this behavior was unusual for the day to day general public that patronize the Tribal Market." [*Id.*].

Officer Butler subsequently drove by Mr. Raniewicz, told Mr. Raniewicz that he liked Mr. Raniewicz's vehicle, and asked him the year of the vehicle. Mr. Raniewicz said that he did not know and looked over at his son, who pulled the paperwork out of the glove compartment and stated it was a 2022 Honda Accord. [*Id.*]. Mr. Raniewicz explained to Officer Butler that it was a rental vehicle. [*Id.* at pp. 6-7]. Officer Butler stated that, while speaking to Mr. Raniewicz, he "noticed that his hands were shaking vigorously and his carotid artery was pulsating heavily." [*Id.* at p. 7].

Officer Butler followed Mr. Raniewicz as he traveled northbound on State Route 87.  Near the intersection of E. Aero Drive and State Route 87, Officer Butler observed Mr. Raniewicz move from the number two lane to the number one lane and only activate his left hand turn signal for approximately twenty feet.[2]  [*Id.* at p. 7].  However, due to heavy traffic conditions on the roadway, Officer Butler believed it to be a safety risk to stop the vehicle.  [*Id.*].  Instead, Officer Butler observed Mr. Raniewicz turn right into the Saw Mill Theater parking lot and then into the parking lot of Chili's.  Mr. Raniewicz and his son exited the vehicle and entered Chili's.  Officer Butler, with Officer Christopher Sanks, conducted surveillance of the vehicle for approximately one hour and twenty minutes.  [*Id.*].

At approximately 6:19 p.m., Mr. Raniewicz and his son exited Chili's, entered the rental vehicle, and began driving southbound on State Route 87.  Officer Butler activated his overhead lights near the intersection of W. Cedar Lane and W. Estate Lane.  Mr. Raniewicz pulled into a car port covered driveway at 209 W. Estate Lane.  [*Id.*].  Officer Butler and Officer Sanks effected a traffic stop.

The court has reviewed the video of Officer Butler's body worn camera.  Mr. Raniewicz and his son exited his vehicle and Mr. Raniewicz asked Officer Butler, "how you doing?"  Officer Butler explained that he was going to stop Mr. Raniewicz earlier because he had failed to signal for 100 feet before he made a lane change.  Mr. Raniewicz responded, "I'm pretty sure I did," to which Officer Butler responded that he signaled for "twenty feet max."  Officer Butler then asked Mr. Raniewicz if he resided at the home and where he was headed.  [Doc. 75-2 at 18:20:20 to 18:20:52].  Mr. Raniewicz explained that the house was an Air BnB that he had rented and that he was visiting from Oklahoma.  [*Id.*].

---

[2] During his conversation with Officer Butler later that evening, Mr. Raniewicz conceded "I did go kinda quick there."  [Doc. 75-2 at 18:28;20 to 18:28:35].

Officer Butler then requested that Mr. Raniewicz provide him his driver's license, rental agreement, and "all that stuff." [*Id.* at 18:20:53 to 18:20:59]. Mr. Raniewicz explained that he lost his license when they were in Arizona, but he had already "put in a thing online" to get another one. [*Id.* at 18:21:21 to 18:21:20]. Mr. Raniewicz stated that his license was valid and that he could give Officer Butler his information. [*Id.* at 18:21:21 to 18:21:25].

Officer Butler then asked Mr. Raniewicz's son to wait in the rental vehicle and for Mr. Raniewicz to come back to his patrol vehicle, which was parked such that it partially blocked the residence's driveway. The patrol vehicle's lights were activated. Officer Butler stated that he was just going to give Mr. Raniewicz a written warning, not a ticket. [*Id.* at 18:21:26 to 18:21:40]. Mr. Raniewicz consented to a pat-down to ensure that he did not have any weapons. [*Id.* at 18:21:41 to 18:22:10].

Officer Butler told Mr. Raniewicz, if he wanted to, to "just stand at [his] passenger window" while he sat in his patrol vehicle. [*Id.* at 18:22:50 to 18:23:05].

Officer Butler proceeded to ask Mr. Raniewicz how long he would be "up here for," when he got the Air BnB, if he knew his driver's license number, and if he had outstanding warrants. [*Id.* at 18:23:06 to 18:23:55]. Mr. Raniewicz answered each question. [*Id.*]. Officer Butler then asked Mr. Raniewicz for his personal identifying information, which Mr. Raniewicz provided. [*Id.* at 18:23:58 to 18:24:50].

Officer Butler questioned Mr. Raniewicz as to whether he and his son had "done anything fun" while in Arizona. Mr. Raniewicz indicated that they had really wanted to go a "spook house," then offered a lengthy explanation to Officer Butler that he had come to Arizona with his buddy, Paul, who was considering buying property there. [*Id.* at 18:24:50 to 18:25:55]. Officer Butler interrupted Mr. Raniewicz and asked for additional personal information, which Mr. Raniewicz

4

provided.  [*Id.* at 18:25:56 to 18:26:34].  For example, Mr. Raniewicz stated that his hair was brown, and then joked, "or what's left of it."  [*Id.*].

Over the next few minutes, Mr. Raniewicz and Officer Butler discussed Mr. Raniewicz's rental car, his radar detector, how best to utilize Mr. Raniewicz's phone's maps app under Arizona's hands-free driving laws, and why Officer Butler had stopped Mr. Raniewicz.  Specifically, Officer Butler explained that the radar detector was improperly mounted on the windshield, and that Mr. Raniewicz had not adequately signaled his lane change when he moved over to go to Chili's.  [*Id.* at 18:26:35 to 18:28:38].  After an approximately five second pause, Mr. Raniewicz asked Officer Butler if he had ever had Chili's cookie with ice cream on it.  [*Id.* at 18:28:43 to 18:28:55].

Approximately ten minutes into the encounter, Officer Butler radioed in to dispatch with Mr. Raniewicz's personal information.  [*Id.* at 18:30:39 to 18:31:07].  Officer Butler then exited his vehicle and Mr. Raniewicz asked him, "am I good?"  Officer Butler responded, "well, I don't know yet, but, hopefully, right, for your sake."  [*Id.* at 18:31:10 to 18:31:20].

Officer Butler directed Mr. Raniewicz to come to the front of his patrol vehicle and asked him to sign the warning, which Officer Butler explained just "acknowledges that I talked to you about it."  [*Id.* at 18:31:20 to 18:31:39].  As Officer Butler tore off the warning, he began to explain to Mr. Raniewicz, "basically man, what he and I are trying to do out here is just make sure there is nothing illegal being moved from state to state, ok?"  Mr. Raniewicz responded, "Yeah, I can see that" and laughs.  Officer Butler asked, "Yeah? Why do you think that? Just assumed it?"  Mr. Raniewicz took possession of the warning as he said, "no, no, it just seems like a lot for the . . . uh."  [*Id.* at 18:31:40 to 18:31:57].

Officer Butler stated, "I literally do this with everybody," then explained that he had stopped four people the night before and had "d[one] it with everybody [he] pulled over."  Officer

Butler assured Mr. Raniewicz that he doesn't "just do it for certain people, ok?" and explained that "some of the stuff we run across, man, is like credit card skimmers, identity theft equipment, prostitutes, narcotics, money, guns, human smuggling, all sorts of stuff." [*Id.* at 18:32:57 to 18:32:15].

Officer Butler then asked Mr. Raniewicz if he had anything illegal in the car. Mr. Raniewicz responded "uh . . . no." Officer Butler followed up with "nothing at all?," to which Mr. Raniewicz responded in the negative. Officer Butler went on to question Mr. Raniewicz as to whether he had six specific drugs in his car. Each time, Mr. Raniewicz responded in the negative. [*Id.* at 18:32:16 to 18:32:52].

After Mr. Raniewicz again stated, "I don't have any drugs in the car, sir," Officer Butler said, "OK. Can I have your consent to search the vehicle . . . make sure that's the case?" Mr. Raniewicz took a large breath and asked, "can I just get my son and go rest? I'm really tired. I mean . . . is that ok?" [*Id.* at 18:32:53 to 18:33:07]. Officer Butler responded, "Alright, let me ask you something, man. He and I are different. I don't take people to jail on little, small things. I'm not out here looking for little, small stuff. I'm out here looking for bulk narcotics being smuggled to other states, ok?" [*Id.* at 18:33:08 to 18:33:20].

Officer Butler then explained to Mr. Raniewicz that he does not book people for small or personal use amounts, but, instead, he "long forms" them where they are charged but are free to leave. Officer Butler expressed that Mr. Raniewicz seemed "kinda uncertain about [his] answers," and told Mr. Raniewicz that he thought he was "hiding something." Eventually, Mr. Raniewicz admitted that he had a "little canister and it's only a bowl" of meth in the vehicle. [*Id.* at 18:33:20 to 18:35:30]. Officer Butler then stated that "with what you've just told me I do have probable

cause to search the entire vehicle.  So be honest with me now because if there's stuff in there you're not supposed to have, I will find it.  Tell me now."  [*Id.* at 18:35:30 to 18:35:45].

Officer Butler told Mr. Raniewicz that he was not free to go.  [*Id.* at 18:35:55 to 18:36:00]. Mr. Raniewicz subsequently asked Officer Butler if Mr. Raniewicz could get the bag of drugs from the vehicle himself, and Officer Butler responded, "no, the car is mine now.  So, I'm going to get your son out of there, I'm going to put him back here with this officer and we're going to go from there and I'm going to conduct a probable cause search of the car."  [*Id.* at 18:36:40 to 18:36:55].

At approximately 6:39 p.m., Officer Butler began searching Mr. Raniewicz's vehicle. During the course of the search, Officer Butler discovered approximately fourteen pounds of methamphetamine. [Doc. 75-1].

## Analysis

Mr. Raniewicz argues that Officer Butler unconstitutionally extended the traffic stop beyond its mission.[3]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It is well-established that "[a] traffic stop, even if brief and for a limited purpose, constitutes a 'seizure' under the Fourth Amendment and is subject to review for reasonableness."  *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020).  "To be reasonable, a 'traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to the mission of the stop itself.'"  *Id.* (quoting *United States v. Cone*, 868 F.3d 1150, 1152 (10th Cir. 2017)).  That is, "the tolerable duration of police inquiries in the traffic-stop context is

---

[3] Mr. Raniewicz does not appear to challenge the constitutionality of the initial traffic stop.  *See* [Doc. 75].  Regardless, because the court concludes that Office Butler unconstitutionally extended the traffic stop, the court does not determine the validity of the initial stop.

determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

Generally, "law enforcement may not . . . divert from the mission of the stop in order to conduct general criminal interdiction or investigate other crimes." *United States v. Cortez*, 965 F.3d 827, 838 (10th Cir. 2020). "After the purpose of the traffic stop is completed, further detention for purposes of questioning unrelated to the initial traffic stop is impermissible unless (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the initial detention has become a consensual encounter." *United States v. Bradford,* 423 F.3d 1149, 1156-57 (10th Cir. 2005). The court separately considers whether Officer Butler had reasonable suspicion and whether the traffic stop became a consensual encounter.

A.       *Reasonable Suspicion*

An officer may only prolong a stop to conduct an unrelated investigation if he or she has the "reasonable suspicion ordinarily required to detain an individual." *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022). "This moment that the stop is prolonged such that reasonable suspicion [is] necessary is referred to as the 'Rodriguez moment.'" *United States v. Batara-Molina,* 60 F.4th 1251, 1255-56 n.1 (10th Cir. 2023).

Here, the "*Rodriguez* moment" occurred when Officer Butler gave Mr. Raniewicz the written traffic warning and began questioning him about unrelated criminal activity. Thus, "the question before [the court] is whether the facts known to him *at that moment* established reasonable suspicion." *Frazier*, 30 F.4th at 1179 (emphasis added).

"Reasonable suspicion accrues when an officer possesses a 'particularized and objective basis for suspecting criminal conduct under a totality of the circumstances.'" *Cortez*, 965 F.3d at

8

834 (quoting *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015)).  "While reasonable suspicion cannot be based upon a mere hunch, it also need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Frazier,* 30 F.4th at 1174 (quoting *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011)). To determine whether reasonable suspicion exists, the court must consider "the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).  "The government bears the burden of proving the reasonableness of the officer's suspicion."  *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010).

In its response, the government does not directly address Officer Butler's reasonable suspicion at the "*Rodriguez* moment."  However, in Incident Report #TA2200614 prepared by Officer Butler and dated October 29, 2022, Officer Butler identifies the following factors as contributing to his reasonable suspicion:  (1) Mr. Ranewicz's nervousness, including physiological responses and efforts to self-soothe and (2) the radar detector in Mr. Ranewicz's vehicle.

The Tenth Circuit "[has] held consistently that nervousness is 'of limited significance' in determining whether reasonable suspicion exists."  *Simpson*, 609 F.3d at 1147 (quoting *United States v. Williams*, 271 F.3d 1262, 1268 (10th Cir. 2001)); *see also United States v. Leon*, — F.4th — , 2023 WL 5838456, at *5 (10th Cir. Sept. 11, 2023).  This is because "it is common for most citizens, 'whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer.'"  *Simpson,* 609 F.3d at 1147 (quoting *United States v. Wood,* 106 F.3d 942, 948 (10th Cir. 1997)).  However, "extreme and persistent nervousness . . . 'is entitled to somewhat more weight.'"  *Simpson*, 609 F.3d at 1148 (quoting *United States v. West*, 219 F.3d 1171, 1179

(10th Cir. 2000)).  "[S]pecific indicia that the defendant's nervousness was extreme" is required, and the court will not "credit an officer's naked assertion." *Simpson*, 609 F.3d at 1148.

In the Incident Report, Officer Butler asserts that Mr. Raniewicz's "hands were shaking vigorously and his carotid artery was pulsating heavily" during their first encounter at the Tribal Market.  [Doc. 75-1, p. 7].  Officer Butler did not contend, however, that Mr. Raniewicz exhibited similar psychological responses during the subsequent traffic stop.  Instead, Officer Butler indicated that Mr. Raniewicz was "stuttering heavily and constantly moving around," which Officer Butler attributed to "extreme amounts of stress caused by" his questioning Mr. Raniewicz regarding his reasons for being in Arizona.

As previously stated, the court has reviewed Officer Butler's body worn camera footage and the court cannot credit Officer Butler's characterization of Mr. Raniewicz during the traffic stop.  Although Mr. Raniewicz initially stutters as Officer Butler questions him regarding his driver's license, it is natural for Mr. Raniewicz to exhibit some nervousness given that he had lost his driver's license and was being confronted by law enforcement.  *See United States v. Wald,* 216 F.3d 1222, 1227-28 (10th Cir. 2000) ("It is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer.").  Further, Officer Butler's assessment of Mr. Raniewicz's speech patterns is of little significance given that the government offers no evidence that Officer Butler had prior acquaintance with defendant prior to October 29, 2023.  *Id.*  Regardless, throughout the majority of the stop, Mr. Raniewicz does not stutter, but, instead, offers calm responses to Officer Butler's questions.  At points, Mr. Raniewicz attempts to joke with Officer Butler, which belies the asserted "extreme amounts of stress."  And Officer Butler cites no inconsistent or illogical answers.  *See Frazier,* 30 F.4th at 1176.

Likewise, the court does not credit Officer Butler's belief that Mr. Raniewicz's question regarding the Chili's cookie was an "attempt to self soothe." *See* [Doc. 75-1, p. 7]. As previously stated, the government offers no evidence that Officer Butler had any prior knowledge of Mr. Raniewicz. Thus, Officer Butler's assessment of Mr. Raniewicz's motivation in discussing the Chili's cookie "is nothing more than an 'inchoate suspicion or hunch.'" *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994) (quoting *United States v. Bloom*, 975 F.2d 1447, 1458 (10th Cir. 1992)).

Finally, Officer Butler's assessment that Mr. Raniewicz was "constantly moving around" is contradicted by the body cam footage. Mr. Raniewicz follows Officer Butler's prompts as to where to move, then stands at the passenger window of his patrol vehicle for an extended period. Mr. Raniewicz's hands are visible and are not shaking. Nor does he move his hands in a furtive or excessive manner.

In addition to nervousness, Officer Butler cited the presence of the radar detector in Mr. Raniewicz's rental vehicle. However, radar detectors "are of little or no significance" in the reasonable suspicion determination. *Simpson,* 609 F.3d at 1152; *see also United States v. Stewart-Poppelsdorf*, 120 F. App'x 230, 233 (10th Cir. 2004) (unpublished) ("[T]he presence of a radar detector is, at best, an indicator of an intent to speed, not an indicator of illegal drug activity.").

Officer Butler cites no additional factors in support of reasonable suspicion. The officer did not identify anything unusual about Mr. Raniewicz's use of a rental vehicle, *United States v. Berg*, 956 F.3d 1213, 1219 (10th Cir. 2020), nor did he point out anything inconsistent or implausible regarding Mr. Raniewicz's travel plans.[4] *Simpson,* 609 F.3d at 1148-50. Rather,

---

[4] Insofar as the government points to Officer Butler's observation that Mr. Raniewicz's reaction to question about methamphetamine was different from his reactions to the questions regarding the other substances, Mr. Raniewicz's response came after the *Rodriguez* Moment and "[f]acts learned

Officer Butler informed Mr. Raniewicz that he "literally do[es] this with everybody," indicating that there was nothing specific to Mr. Raniewicz that warranted further questioning.

Viewing the totality of the circumstances, the factors are insufficient to establish a reasonable suspicion. Disregarding all factors with an innocuous explanation, Officer Butler's belief that Mr. Raniewicz was engaged in criminal activity amounts to little more than hunch. "Reasonable suspicion is a low bar, but it is not that low." *Frazier,* 30 F.4th at 1178. Thus, Officer Butler lacked reasonable suspicion to prolong the stop.

       B.     *Consensual Encounter*

The government suggests that Mr. Raniewicz and Officer Butler engaged in a voluntary encounter. *See* [Doc. 94, pp. 8-9].

The Tenth Circuit has recognized that "[a] traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." *Bradford,* 423 F.3d at 1158. "Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter." *Id.*

The Tenth Circuit has adopted a "bright-line rule that requires the driver's documents to be returned before the stop may be considered a consensual encounter." *United States v. Mercado-Gracia*, 989 F.3d 829, 836 (10th Cir. 2021) (quoting *United States v. Gomez-Arzate*, 981 F.3d 832, 842 (10th Cir. 2020)). However, return of a driver's documentation is not always sufficient to

---

later in the investigation are irrelevant." *Frazier*, 30 F.4th at 1179. For this same reason, the automobile exception is inapplicable.

render an interaction consensual and a court should consider "several non-exclusive factors," including:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*Mercado-Gracia*, 989 F.3d at 836 (quoting *Gomez-Arzate*, 981 F.3d at 842).

Here, the encounter occurred in an open place. However, the location was the curtilage of a private residence and the encounter occurred at night, which suggest more coercive circumstances. Officer Butler did not touch Mr. Raniewicz, nor was he physically restrained. However, the patrol vehicle was parked at the end of the driveway, partially blocking it with its patrol lights activated. Both Officer Butler and Officer Sanks were in uniform, but did not display their weapons.

With respect to demeanor, Officer Butler first asked Mr. Raniewicz if he had anything illegal in the vehicle, then persisted in asking him a series of questions regarding specific drugs. Despite Mr. Raniewicz denying have anything illegal in the vehicle, Officer Butler requested Mr. Raniewicz's permission to search it. Officer Butler then told Mr. Raniewicz that he seemed "kinda uncertain about [his] answers," and that he felt like Mr. Raniewicz was "hiding something." The Tenth Circuit has recognized that "'accusatory, persistent, and intrusive' questioning may turn an otherwise voluntary encounter into a coercive one if it conveys the message that compliance is required." *United States v. Hernandez*, 93 F.3d 1493, 1499 (10th Cir. 1996) (citing *Florida v. Bostick*, 501 U.S. 429 (1991)). The nature of Officer Butler's persistent questioning conveyed that compliance was required.

Turning to whether Officer Butler had retained Mr. Raniewicz's personal effects, because Mr. Raniewicz had lost his driver's license and was driving a rental vehicle, Officer Butler did not take possession of his personal property.  However, Officer Butler did not give Mr. Raniewicz the written warning until after he had begun questioning defendant.

Finally, Officer Butler did not specifically advise Mr. Raniewicz that he was free to leave. Instead, in response to Mr. Raniewicz's question, "am I good?,"  Officer Butler responded, "well, I don't know yet, but, hopefully, right, for your sake."  Officer Butler's response suggests that Mr. Raniewicz was *not* free to leave. *See United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir. 1994) ("No one who is seated in a law enforcement officer's vehicle after having been stopped by the officer for a perfectly legitimate reason, and who then asks whether the stop is at an end ('That's it?') and is immediately told 'No' and to 'wait a minute,' can reasonably view himself or herself as free to leave . . . .").

As in *Sandoval,* just a few seconds elapsed before Officer Butler began to question Mr. Raniewicz regarding the contents of the vehicle and if he could search same.  "At no point did the nature of those inquiries change the climate so that the reasonable listener would view participation in the exchange as freely terminable."  *Sandoval,* 29 F.3d at 542.

Under the circumstances, Officer Butler's and Officer Sanks' conduct would have conveyed to a reasonable person that he or she was not free to decline the officers' requests or otherwise terminate the encounter.  Thus, no consensual encounter took place and Mr. Raniewicz was unconstitutionally seized for purposes of the Fourth Amendment.

C.      *Voluntary Consent*

The government contends that, regardless, the search of Mr. Raniewicz's vehicle was permissible based on the consent exception to the warrant requirement.  *See* [Doc. 94, pp. 8-9].

The Tenth Circuit has recognized that "[a] search preceded by a Fourth Amendment violation remains valid if the consent to search was voluntary in fact under the totality of the circumstances." *Fernandez*, 18 F.3d at 881. "'Voluntary consent' consists of two parts: (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given." *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012). "The government bears the burden of proving the voluntariness of consent, and that burden is heavier when consent is given after an illegal stop." *Fernandez*, 18 F.3d at 881 (internal citation omitted).

The government does not argue that Mr. Raniewicz explicitly consented to a search of his vehicle, but instead asserts that Mr. Raniewicz impliedly consented to the search. "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007). Instead, consent may be indicated "through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." *Id.* at 789-90. Implied consent to search is no less valid than express consent to search. *Jones*, 701 F.3d at 1321.

In response to Officer Butler's request to search the vehicle, Mr. Raniewicz replied, "I mean . . . can I just get my son and go rest? I'm really tired. I mean is that ok?" Mr. Raniewicz did not move toward the vehicle or nod his head. Rather, he shakes his head as he asks if he can just get his son and go rest. Under the circumstances, no reasonable officer could believe that Mr. Raniewicz was consenting to a search of his vehicle.[5]

Further, even if Mr. Raniewicz had consented, under the circumstances, the consent "was insufficient to purge the taint of his unlawful detention." *United States v. Caro*, 248 F.3d 1240,

---

[5] In fact, it appears that Officer Butler did not interpret Mr. Raniewicz's response as consent, because Officer Butler did not move to search the vehicle. Instead, Officer Butler began what he described as a "probable cause" search only after Mr. Raniewicz admitted that there was methamphetamine in the vehicle.

1247-48 (10th Cir. 2001).  As previously stated, at the time Officer Butler requested consent, he had not informed Mr. Raniewicz that he was free to go.  Further, the request came only one minute and ten seconds after Officer Butler had given Mr. Raniewicz the written warning, ending the permissible scope of the *Terry* stop.  There were no intervening circumstances.  Finally, Officer Butler was clearly acting with an intent to investigate criminal conduct unrelated to the traffic stop.  Thus, assuming that Mr. Raniewicz had consented, the consent did not purge the taint of Mr. Raniewicz's unlawful detention.  *See Caro*, 248 F.3d at 1247-48.

## Conclusion

After Officer Butler completed the purpose of the traffic stop, he impermissibly extended the stop without reasonable suspicion or consent.  Mr. Raniewicz's continued seizure thereafter was in violation of the Fourth Amendment.  "Accordingly, the evidence discovered because of that seizure is tainted by its unlawfulness and is inadmissible." *Frazier*, 30 F.4th at 1180 (citing *Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963)).

WHEREFORE, the Motion to Suppress Evidence [Doc. 75] of defendant Joseph Raniewicz is granted.

IT IS SO ORDERED this 22nd day of September, 2023.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE